## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

LESTER WALLACE,           :

                          :

                          :

        Plaintiff,        :

                          :        **Civil Action No.**

        v.               :        **7:04-CV-78 (HL)**

                          :

GEORGIA DEPARTMENT OF        :

TRANSPORTATION,         :

                          :

                          :

        Defendant.     :

## <u>ORDER</u>

Before this Court are two motions for summary judgment, one filed by Plaintiff (Doc. 48) and the other filed by Defendant (Doc. 49). For the reasons set forth below, Defendant's motion is granted in part and denied in part, and Plaintiff's motion is denied.

## I.    FACTS

Plaintiff, a black male, began his employment with the Georgia Department of Transportation ("GDOT") in 1988 as a Temporary Maintenance Worker. (Wallace Dep. at 48.) Since that time Plaintiff has been promoted several times and, at the time of his deposition, held the position of District Earthworks Coordinator. (Wallace Dep. at 48-65.)

In July of 2001, Plaintiff received a rating of "Met Expectations" on his performance evaluation for the preceding year, making him eligible for a performance based increase. (Wallace Dep. at 96-97; Cowan Aff. ¶ 6; Crim Aff. ¶ 7.) On November 19, 2001, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"),

charge number 11BA20035, alleging that he had been assigned duties outside his job description, particularly State Aid and Erosion Control, from January of 2001 through July 19, 2001.  (Wallace Dep. at 168-72; Def's. Mot. Summ. J., Ex. 4.)  In the charge Plaintiff also alleged that his Performance Management Form, dated July 19, 2001, inaccurately reflected "Met Expectations."  (Wallace Dep. 168-72; Def's. Mot Summ. J., Ex. 4.)  Plaintiff was issued a Notice of Rights for EEOC charge number 11BA20035 on May 21, 2002, which he received shortly thereafter.  (Wallace Dep. at 144-45; Def's. Mot. Summ. J., Ex. 5.)

As a result of a GDOT employee's allegations of workplace violence against a coworker and the responding allegation of sexual harassment, the GDOT initiated an investigation at the end of May of 2002.  (Cowan Aff. ¶ 7; Crim Aff. ¶ 8.)  During the course of the investigation, the two parties' e-mail accounts, internet usage, and computer hard drives were surveyed.  (Cowan Aff. ¶ 8; Crim Aff. ¶ 9.)  This survey revealed that several employees had sent or received sexually explicit materials through GDOT e-mail.  (Cowan Aff. ¶ 8; Crim Aff. ¶ 9.)  A review of those e-mail accounts, internet usage, and computer hard drives revealed further inappropriate use by employees of GDOT resources, including communicating sexually explicit materials and/or visiting non-work related websites.  (Cowan Aff. ¶ 8; Crim Aff. ¶ 9.)

The GDOT Online Policy and Procedure System, at section 255-1, prohibits the use of public property for any activity which is not officially approved.  The Internet Guidelines further limit internet use and e-mail use to GDOT business.  (Crim Aff. ¶ 10.)  The Internet Resources Available Use Policy prohibits personal non-work related use.  (Crim Aff. ¶ 11.)  The GDOT

2

Employee Handbook specifically outlines that GDOT's computers, internet, and e-mail are intended for business use only.  (Crim. Aff. ¶ 12.)

In March of 1999, David Crim (holding the position of District Engineer) issued a memorandum to the supervisory personnel of District IV, stating that they were to ensure that all employees were aware that GDOT policy specifically prohibited personal use of department computers, including internet and e-mail, at all times. (Crim Aff. ¶ 13.)  In  February of 2000, Crim issued a memorandum to all District IV employees forewarning everyone that two GDOT employees had been dismissed from employment due to misuse of GDOT's computer equipment, including e-mail and internet usage.  (Crim Aff. ¶ 14.)    Based on the material, content, and volume of computer misuse uncovered in the investigation, eleven individuals were subjected to disciplinary action ranging from a written reprimand to dismissal.  (Wallace Dep. at 129-30; Cowan Aff. ¶ 15; Crim. Aff. ¶ 9.)   One Caucasian male was dismissed; two Caucasian males and six Caucasian females were suspended without pay for a periods ranging from one day to two weeks; and Plaintiff (an African-American male) and one African-American female were issued written reprimands.  (Wallace Dep. at 129-30; Cowan Aff. ¶ 10; Crim Aff. ¶ 16.)

Defendant reviewed Plaintiff's computer usage and concluded that it indicated multiple visits to non-work related websites, and the spending of state time and equipment for personal use.  (Wallace Dep. at 129-30; Cowan Aff. ¶ 11; Crim Aff. ¶ 17.)  Plaintiff was issued a written reprimand on June 28, 2002, for violation of GDOT policies regarding computer usage.

(Wallace Dep. at 129-30; Cowan Aff. ¶ 11; Crim Aff. ¶ 17.)

On July 2, 2002, Plaintiff submitted a note to his immediate supervisor, Mr. Spradley. (Wallace Dep. at 244-45; Cowan Aff. ¶ 12; Crim Aff. ¶ 18; Spradley Aff. ¶ 5.)  Plaintiff's note stated that Plaintiff was reporting an injury that occurred on June 28, 2002, which is also the date Plaintiff received his written reprimand.   (Wallace Dep. at 244-45; Cowan Aff. ¶ 12; Crim Aff. ¶ 18; Spradley Aff. ¶ 5.)  The note stated that Plaintiff was reporting emotional stress from his job and GDOT related issues.   (Wallace Dep. at 244-45; Cowan Aff. ¶ 12; Crim Aff. ¶ 18; Spradley Aff. ¶ 5.)  Plaintiff informed Spradley that he had been having problems sleeping and might need counseling.  (Wallace Dep. at 244-45; Cowan Aff. ¶ 12; Crim Aff. ¶ 18; Spradley Aff. ¶ 5.)

As a result, Spradley consulted with Brian Fincher (holding the position of District Safety Officer), Joe Cowan (holding the position of District Construction Engineer), and Jan Dunn (holding the position of Officer/Employee Assistance Program Coordinator) about assisting Plaintiff with any necessary counseling.  Both Spradley and Cowan offered Plaintiff counseling; however, Plaintiff refused.  (Wallace Dep. at 244-45, 247-48; Cowan Aff. ¶ 13; Crim Aff. ¶ 19; Spradley Aff. ¶ 6.)

On July 8, 2002, Plaintiff reported to Spradley that he was experiencing pain his hands and arms. (Cowan Aff. ¶ 14; Crim Aff. ¶ 20; Spradley Aff. ¶ 7.)  At that time, Spradley initiated a Workers' Compensation claim on Plaintiff's behalf.  (Cowan Aff. ¶ 14; Crim Aff. ¶ 20; Spradley Aff. ¶ 7.)   On July 9, 2002, Fincher, Craig Solomon (holding the position of

4

Microsystems Support Specialist), and Spradley went to Plaintiff's office to view Plaintiff's desk, office arrangements, amount and type of computer usage, and posture while performing computer duties to assess whether any changes could be made to minimize Plaintiff's pain. (Wallace Dep. at 240-44; Spradley Aff. ¶ 8.)  The group observed that Plaintiff's desk was raised several inches higher than normal.  (Wallace Dep. at 240-44; Spradley Aff. ¶ 8.)  Plaintiff admits that he had raised the desk.  (Wallace Dep. 240-44.)  Plaintiff was advised that the desk height could have been causing his pain.  (Spradley Aff. ¶ 8.)  Afterwards, Plaintiff approved a new desk which was ordered for him.  (Wallace Dep. at 242-43.)

On July 11, 2002, Plaintiff submitted a note from Dr. Patterson indicating that Plaintiff was restricted to limited repetitive work and from lifting more than ten pounds.  (Wallace Dep. at 155-56; Cowan Aff. ¶ 16; Spradley Aff. ¶ 9.)  GDOT assisted Plaintiff during this restrictive period by allowing him alternative work such as riding around to view projects and by allowing him to take frequent breaks.  (Cowan Aff. ¶ 17; Spradley Aff. ¶ 10.)  Additionally, Plaintiff was provided with a computer mouse that, as he testified, "helped a whole lot to come over [sic] my pain and stuff."  (Wallace Dep. at 81.)

On August 2, 2002, Plaintiff filed a second EEOC charge, numbered 11BA200199, which alleged that he was denied reasonable accommodation in June of 2001 for an injury to his right hand and arm as a result of repetitive computer usage.  Plaintiff further alleged that he was denied reasonable accommodation in July of 2002 for an injury to his left hand and arm as a result of repetitive computer usage.  Additionally, Plaintiff alleged that he was issued a written

reprimand on June 28, 2002, that was the result of racial discrimination and retaliation. (Wallace Dep. at 174-77.; Def's. Not. of Filing Ex., Ex. 7.)  Plaintiff was issued a Notice of Suit Rights on EEOC charge 11BA200199 on December 20, 2002.  (Def's. Mot. Summ. J., Ex. 7.)

On August 8, 2002, Dr. Patterson, issued a work status report indicating that Plaintiff had no work restrictions and had 0% disability.  (Wallace Dep. at 156-57, Cowan Aff. ¶ 19; Crim Aff. ¶ 25; Spradley Aff. ¶ 12.)  On August 9, 2002, Plaintiff left an envelope on Crim's desk; the envelope contained various documents including letters and interdepartmental correspondence.  (Crim Aff. ¶ 26.)  Crim interpreted this action as Plaintiff complaining about discrimination in the workplace.  (Crim. Aff. ¶ 26.)

In response, on August 15, 2002, Debbie Goff (holding the position of District EEO Review Officer) and Crim met with Plaintiff to discuss any problems or issues that he was having.  (Crim. Aff ¶ 27.)  Plaintiff related concerns regarding work assignments involving State Aid Projects. Further, he informed Goff and Crim that using his computer mouse caused pain in his hand.  (Crim. Aff ¶ 27.)  Additionally, Plaintiff wanted to know the chain of command should he have any problems.  (Crim. Aff ¶ 27.)  Also, Plaintiff expressed concerns regarding a written reprimand he received in June of 2002.  (Crim. Aff ¶ 27.)

During the August 15, 2002, meeting Crim asked Plaintiff if his hand was better.  (Crim Aff. ¶ 28.)  Plaintiff responded that it was better, but some problems still remained in his right thumb and left elbow.  (Crim Aff. ¶ 28.)  Plaintiff stated that he was receiving cortisone shots as treatment.  (Crim Aff. ¶ 28.)  Plaintiff stated that the height of his desk had caused his

problems, but that the new desk ordered for him would work.  (Crim Aff. ¶ 28.)  Plaintiff did

not request any form of accommodation at the meeting.  (Crim Aff. ¶ 28.)  Crim told Plaintiff

that his door was always open should Plaintiff have any concerns that needed to be addressed.

(Crim Aff. ¶ 29.)  Additionally, Crim assured Plaintiff that his written reprimand was in the past

and could be overcome as long as the misuse of GDOT equipment did not continue and as long

as Plaintiff did his job satisfactorily.  (Crim Aff. ¶ 29.)

Plaintiff filed this case in the United States District Court for the Northern District of

Georgia.  Plaintiff filed a motion to transfer the case to this Court, which was granted.  The

parties filed cross-motions for summary judgment.

## II.    LAW

If "there is no genuine issue as to any material fact and . . . the moving party is entitled

to a judgment as a matter of law," then summary judgment must be granted.  Fed. R. Civ. P.

56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact

arises only when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When

considering a motion for summary judgment, the Court must evaluate all of the evidence,

together with any logical inferences, in the light most favorable to the non-moving party.

Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995).  The Court

may not, however, make credibility determinations or weigh the evidence.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" which would entitle the moving party to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).  If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law. Id. at 324-26.  This evidence must consist of more than mere conclusory allegations.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Here, Defendant moved for summary judgment on all claims, and the Court construes Plaintiff's claim as moving for summary judgment on his retaliation claim, undesirable work assignment claim, performance management claim, and disparate impact claim.

### A.       David Crim, Joe Cowan, and Roger Fowler: Service and Individual Liability

The Court recognizes a problem with the presence of David Crim, Joe Cowan, and Roger Fowler in this action to the extent that Plaintiff seeks to impose individual liability upon them. Title VII makes it unlawful for an "employer" to discriminate against employees.  48 U.S.C.A.

§ 2000e-3(a) (West 2003).  Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C.A. § 2000e(b).  Additionally, the definition of employer in Title VII is like the definition of employer in the ADA.  Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996).  In interpreting these definitions, the Eleventh Circuit has held that individual liability does not exist under Title VII, Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991), or under the ADA, Mason, 82 F.3d at 1009.

Defendant argues that neither Crim, Cowan, nor Fowler meet the definition of an "employer" under Title VII or the ADA.  Defendant claims that Plaintiff is suing these men as individuals.  Thus, Defendant asserts, they are not proper parties to this case.  In response, Plaintiff makes arguments about the roles of these men in alleged discriminatory acts, but he does not address whether the men meet the definition of an "employer" under Title VII or the ADA.  In light of Busby and Mason, the Court agrees with Defendant.  Therefore, to the extent that Plaintiff seeks to sue Crim, Cowan, and Fowler in their individual capacities under Title VII and the ADA – and because Plaintiff has asserted no state law claims – Crim, Cowan, and Fowler are improper parties to this case.  To the extent, however, that Plaintiff's complaint can be construed as alleging that these men are state officials and are being sued in their official capacities for his ADA claim, the issue will be addressed at a later point in this Order.

**B.      Statute of Limitations – Charge # 11BA200199**

Before a potential plaintiff may sue for discrimination under Title VII, he must first exhaust his administrative remedies.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  "The first step down this path is filing a timely charge of discrimination with the EEOC." Id. (citing 42 U.S.C. § 2000e-5(b) (1994); Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir. 2000)).  "For a charge to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act."  Id. (citing 42 U.S.C. § 2000e-5(e)(1) (1994); Howlett v. Holiday Inns, Inc., 49 F.3d 189, 197 (6th Cir. 1995)).

"'[D]iscrete discriminatory acts [such as termination, failure to promote, denial of transfer, or refusal to hire] are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'"  Shields v. Fort James Corp., 305 F.3d 1280, 1281 (11th Cir. 2002) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).  A hostile work environment claim, however, should be reviewed in its entirety, so long as one of the events comprising it falls within the statute of limitations.  Shields, 305 F.3d at 1281-82.  When a claimant makes allegations of a hostile environment and discrete acts of discrimination, courts apply the appropriate analysis to each type of claim.  See generally, Morgan, 536 U.S. at 108-121.  An untimely discrete act claim cannot be saved by including it in a lawsuit with a hostile environment claim.  Thomas v. Ala. Council on Human Relations, Inc., 248 F. Supp. 2d 1105, 1117 (M.D. Ala. 2003) (citing Morgan, 536 U.S. at 122).

Here, Plaintiff filed charge # 11BA200199 on August 2, 2002.  The charge lists three

claims. First, on June 28, 2002, Plaintiff alleges he was subjected to a retaliatory disciplinary action in the form of a written reprimand for making a request for a reasonable accommodation. Second, on June 22, 2001, and on July 11, 2002, Plaintiff alleges he was denied a request for a reasonable accommodation. Third, from June 22, 2001, until June 28, 2002, Plaintiff alleges that he was subjected to disparate treatment.

Under the 180-day limitations period, the aspects of Plaintiff's Title VII claim that alleged discrete discriminatory acts and that occurred prior to October 6, 2001, are time-barred, and Defendant is entitled to summary judgment on those claims. Additionally, to the extent that Plaintiff relies on a hostile work environment claim, and the above incidents relate to that claim, the claim is reviewed in its entirety because at least one of the events comprising it fell within the limitations period.

**C.      Statute of Limitations – Charge # 11BA200035**

42 U.S.C.A. § 2000e-5(f)(1) requires a plaintiff to file suit within ninety days of receiving his right-to-sue notice from the EEOC. Norris v. Fla. Dep't of Health and Rehabilitative Servs.,730 F.2d 682, 682 (11th Cir. 1984). In Norris the Eleventh Circuit held that suits filed even one day late are time-barred. Id. at 683.

Here, on November 19, 2001, Plaintiff filed a charge of discrimination with the EEOC alleging that he had been assigned duties outside his job description, particularly with regard to the State Aid Erosion Control, from January of 2001 through July 19, 2001. Plaintiff also alleged that his Performance Management Form, dated July 19, 2001, inaccurately reflected a

"Met Expectations" rating rather than "Exceeds Expectations" rating.

On May 21, 2002, Plaintiff was issued a Notice of Suit Rights on charge # 11BA200035, which indicated that his lawsuit must be filed within ninety days from receipt of the notice. (Wallace Dep. at 144-45; Def.'s Resp. Pl.'s Mot. Summ. J., Ex. # 2.)   In his response to Defendant's Motion for Summary Judgment, Plaintiff argues that he did in fact file suit within the proper time frame.  The docket reveals, however, that Plaintiff filed his lawsuit on March 10, 2003.  Thus, the time span between May 21, 2002 and March 10, 2003, which is almost a year, belies Plaintiff's assertion.  Therefore, Plaintiff's claims regarding: (1) undesirable work assignments from January of 2001 through July 19, 2001; and (2) unfair Performance Management ratings on July 19, 2001, are both time-barred, entitling Defendant to summary judgment on those claims.  Consequently, Plaintiff's Motion for Summary Judgment on the undesirable work assignment claim and performance management claim is denied.

However, to the extent that those claims can provide evidence for Plaintiff's timely hostile work environment claim, they shall remain for consideration in relation to that claim. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) ("It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

### D.      Disparate Treatment Based on Race

As the United States Court of Appeals for the Eleventh Circuit explained, "There are two types of discrimination actionable under Title VII, disparate treatment and disparate impact." Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999).  A plaintiff must prove an employer's discriminatory intent to prevail on a disparate treatment claim.  Id.  The Court construes Plaintiff's disparate treatment claims to include: (1) disparate treatment in discipline; (2) retaliation; and (3) hostile work environment.  The Court shall address each claim in turn.

### 1.      Disparate Treatment in Discipline

To establish disparate treatment in discipline, Plaintiff must first make out a prima facie case demonstrating: (1) that he belongs to a protected class under Title VII; (2) that he was qualified for the job; and (3) that a similarly situated employee outside his class engaged in the same or similar misconduct but did not receive similar discipline." Alexander v. Fulton County, Ga., 207 F.3d 1303, 1336 (11th Cir. 2000).  Once Plaintiff makes a prima facie showing, the burden then shifts to Defendant to provide a specific legitimate non-discriminatory reason for disciplining the employees differently.  Alexander, 207 F.3d at 1336 (citing Burdine, 450 U.S. at 254-55; Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999)).  Finally, Plaintiff must show that Defendant's legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the treatment was motivated by illegal discrimination.  Id. (citing Burdine, 450 U.S. at 256; Lathem, 172 F.3d at 793; Combs, 106 F.3d at 1529-38).

13

a.      **Plaintiff's Prima Facie Case for Disparate Treatment in Discipline**

Here, the Court finds that Plaintiff meets the first prong of his prima facie case and shall assume without deciding that Plaintiff meets the second prong.  Therefore, this analysis shall focus on the third prong, which deals with similarly-situated employees and different treatment. "'The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed.'"  Maynard, 342 F.3d at 1289  (quoting Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)).  The Eleventh Circuit explained, "[T]o satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Silvera, 244 F.3d at 1259 (internal citations and quotation marks omitted).

Here, eleven individuals were subjected to disciplinary action as a result of an investigation of misuse of department computer equipment.  The investigation revealed that these individuals had engaged in inappropriate use of Defendant's resources, including communicating sexually explicit materials and/or visiting non-work related internet websites.

Of the eleven employees disciplined, one was fired, eight were suspended without pay for periods ranging from one day to two weeks, and two were issued written reprimands.  The differing punishment was based on the material content and volume of misuse.  The two individuals receiving the lesser of the disciplinary actions, the written reprimands, were Plaintiff, who is an African-American male, and another employee who is an African-American

14

female.  The remaining nine individuals who were either fired or suspended are Caucasian.

Thus, Defendant argues that Plaintiff failed to show that similarly situated individuals outside

the suspect class were treated more favorably – in fact, Defendant argues it has shown the

opposite.  But, if discipline was meted out based on the material content and volume of misuse,

it seems as though the comparators' conduct referenced above is not nearly identical, making

these examples unhelpful.

Nevertheless, Plaintiff's argument does not focus as heavily on the severity of the

discipline.  Rather, Plaintiff's argument is that the investigation itself was discriminatory

because it excluded certain people based on race.  Specifically, Plaintiff alleges that Ricki

Fowler, a white female, was not disciplined for having sent inappropriate e-mails.  Plaintiff

submitted a copy of an e-mail that purports to be sent from Ms. Fowler.  (Plf's. Reply Def's.

Response Plf's. Mot. Summ. J., Ex. 4.)  Attached to this e-mail is a pornographic picture of an

elderly gentleman, adorned with beads and exposing his penis.  (Plf's. Reply Def's. Response

Plf's. Mot. Summ. J., Ex. 4.)

Plaintiff has not offered evidence that a white employee was disciplined for engaging in

nearly identical behavior.  In fact he has done better than that; Plaintiff has offered evidence that

a white employee was not disciplined for engaging in what could be characterized as worse

behavior than that in which he engaged and for which he was disciplined.  Thus, Plaintiff has

met the low burden of establishing his prima facie case for disparate treatment in discipline.

### b.    Defendant's Legitimate Non-Discriminatory Reason

Once Plaintiff makes a prima facie showing, the burden then shifts to Defendant to provide a specific legitimate non-discriminatory reason for disciplining the employees differently.  Alexander, 207 F.3d at 1336 (citing Burdine, 450 U.S. at 254-55; Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999)).  Reprimanding an employee for violating company policies or rules can be a legitimate non-discriminatory reason.  Cabiness v. YKK (USA), Inc., 859 F. Supp. 582, 588 (M.D. Ga. 1994).  Also, in some circumstances an employer's ignorance or unawareness of facts can constitute a legitimate non-discriminatory reason.  McGorrian v. E.M.S.A., 85 Fed. Appx. 1, 4 (3d Cir. 2003) (stating a reason was legitimate and non-discriminatory when the person singularly responsible for making hiring decisions did not know of complainant's employment application when a position was available); Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, (D.C. Cir. 2003) (reason for not interviewing complainant was legitimate and non-discriminatory when employer did not interview employee because it did not know employee was still interested); Dionne v. Shalala, 209 F.3d 705, 712 (8th Cir. 2000) (finding governmental agency's ignorance of its own regulations to be a legitimate non-discriminatory reason).

Here, Defendant asserts that based on the material, content, and volume of computer misuse uncovered in the investigation of improper computer usage, eleven individuals were subjected to disciplinary action ranging from a written reprimand to dismissal.  (Wallace Dep. at 129-30; Cowan Aff. ¶ 15; Crim. Aff. ¶ 9.)  The African-American employees, which included

Plaintiff, received lesser punishment than the Caucasian employees.

Regarding Plaintiff's reprimand, a review of Plaintiff's computer usage indicated multiple visits to non-work related websites, and spending state time and equipment for personal use,  (Wallace Dep. at 129-30; Cowan Aff. ¶ 11; Crim Aff. ¶ 17.), in violation of GDOT policies and directives.  As a result, Plaintiff was issued a written reprimand on June 28, 2002. Regarding the Fowler e-mail, Defendant asserts that the decision makers in charge of discipline were not aware of the pornographic image allegedly sent by her.

Consequently, Defendant asserts that Plaintiff was disciplined for policy and directive violations, not because of race, and Fowler was not disciplined because Defendant was not aware of her conduct, not because of race.  The Court finds these reasons to be legitimate and non-discriminatory, and Defendant has met its low burden at this stage of the burden shifting analysis.

### c.      Plaintiff's Proof of Pretext

After a defendant offers a legitimate non-discriminatory reason, the plaintiff must show that the defendant's legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the treatment was motivated by illegal discrimination.  Alexander, 207 F.3d at 1336 (citing Burdine, 450 U.S. at 256; Lathem, 172 F.3d at 793; Combs, 106 F.3d at 1529-38).  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason to demonstrate pretext; instead, he must meet it head on and rebut it.  Wilson v. B/E Aerospace, Inc., 376 F.3d

1079, 1088 (11th Cir. 2004).  Quarreling with the employer's reason is not sufficient.  <u>Id.</u>  The evidence of pretext may include, however, the same evidence offered initially to establish the prima facie case.  <u>Id.</u>

Here, Plaintiff claims that Defendant's reason for issuing the reprimand was "pretextual." (Doc. 52, Plf's. Resp. Def's. Mot. Summ. J. at 5.)  While Plaintiff's pretext argument is not entirely clear, Plaintiff seems to attack the credibility of Defendant's assertion regarding not knowing about the Fowler e-mail.  Plaintiff attacks the assertion by way of the relationship between those who Defendant chose to investigate and the timing of the inappropriate e-mails, including Fowler's.  Resolving this issue requires weighing the evidence and making credibility determinations, which are functions for the jury at trial, not for this Court at the summary judgment stage.  Therefore, Defendant's Motion for Summary Judgment for Plaintiff's claim of disparate treatment in discipline under Title VII is denied.  For these same reasons, the Court cannot grant Plaintiff's Motion for Summary Judgment on this issue, and it is denied.

## 2.  Retaliation

Under Title VII employers may not "discriminate against . . . [an] employee[ ] or applicant[ ] for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." <u>Shannon v. BellSouth Telecomm., Inc.</u>, 292 F.3d 712, 715 n.1 (11th Cir. 2002).  Title VII's protection extends to employees who use their employer's internal grievance procedures.

Rollins v.  Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).

There are three steps in analyzing a retaliation claim under Title VII.  First, a claimant must establish his prima facie case.  Second, if a plaintiff can establish a prima facie case, then the defendant must offer a legitimate, non-retaliatory reason for the adverse employment action. Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  Third, if the defendant offers a legitimate non-discriminatory reason, the plaintiff retains the ultimate burden of proving beyond a preponderance of the evidence that the defendant's actions are pretext for the retaliatory conduct if the claim is to survive.

To establish his prima facie case, a plaintiff must show that:  (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (citing Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998)).  Defendant does not dispute that Plaintiff has met the first factor.  Therefore, the Court shall focus on the second and third factors.

### a.      Adverse Employment Action

Plaintiff must show that he suffered an adverse employment action.  Weeks, 291 F.3d at 1311.  To qualify as adverse, the employment action must be "objectively serious and tangible enough" to alter an employee's "compensation, terms, conditions, or privileges of employment,

19

deprive . . . her of employment opportunities or adversely affects . . . her status as an employee."  <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d 571, 588 (11th Cir. 2000) (internal quotation marks omitted).  Nevertheless, an action which fails to seriously and materially affect an employee's employment is not an adverse action.  <u>Id.</u> at 617; <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1240 (11th Cir. 2001).

Here, Defendant argues that Plaintiff's reprimand was not an adverse employment action because it had "no effect on his employment status."  (Def's. Resp. Plf's. Mot. Summ. J. at 15.)  Defendant's argument finds support in the decisions of the Fifth Circuit, which speculated that while reprimands unaccompanied by ultimate employment decisions may be actionable under § 1983, they may not be actionable under Title VII.  <u>See</u> <u>Sharp v. City of Houston</u>, 164 F.3d 923, 933 n.21 (5th Cir. 1999); <u>see also</u> <u>Banks v. E. Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570, 580 (5th Cir. 2003) ("We recognize that § 1983's definition of adverse employment action may be broader than Title VII's definition.").  Defendant's argument finds more support in decisions of the Seventh and Sixth Circuits which have held, without comparison to § 1983, that "a letter of reprimand is not an adverse employment action unless the letter is accompanied by some other action, such as job loss or demotion."  <u>Krause v. City of La Crosse</u>, 246 F.3d 995, 1000 (7th Cir. 2001); <u>Howard v. Bd. of Educ. of Memphis City Schs.</u>, 01-6433, 2003 WL 21518725 at *7 (6th Cir. July 1, 2003).  Some courts have even gone so far as to hold that written reprimands received by an employee pursuant to employer's progressive disciplinary process were not adverse employment actions under Title VII, even though each reprimand brought

employee closer to termination.  Rennard v. Woodworker's Supply, Inc., 03-8031, 2004 WL 1260309 at *10 (10th Cir. June 9, 2004); Oest v. Ill. Dep't of Corr., 240 F.3d 605, 613 (7th Cir. 2001).  The Court finds these cases persuasive.

        Nevertheless, the Court refuses to apply these cases here for three reasons.  First, in this circuit reprimands are among the employment actions generally considered to be "adverse."  See Stavropoulos v. Firestone, 361 F.3d 610, 619 (11th Cir. 2004).  Second, the Eleventh Circuit does not appear to recognize that § 1983's definition of adverse employment action may be broader than Title VII's definition.  Id. (discussing adverse employment actions in the context of a First Amendment retaliation claim and noting the standard for analyzing an adverse employment action is "consonant" for First Amendment and Title VII cases).  In fact, the Stavropoulos court affirmed this Court's ruling that because a claimant had failed to demonstrate an adverse employment action under Title VII, he also had therefore failed to do so under § 1983.  Id. at 620.

        Third, the Davis court appears to find a reprimand that brings an employee closer to termination or may subject the employee to further discipline may be adverse.  245 F.3d at 1240-41.  In Davis, the Eleventh Circuit analyzed whether  two "negative job performance memoranda placed in [the employee's] file" constituted adverse employment actions.  Id. Regarding the first memorandum, the Davis court stated, "It is undisputed that [the employee] did not suffer any tangible consequence . . . in the form of a loss of pay or benefits or further discipline."  Id.  Additionally, the second memorandum was not a reprimand that could: (1)

result in more formal discipline; (2) affect the plaintiff's salary; (3) reduce the plaintiff's benefits; (4) or disqualify plaintiff from promotions. Id. at 1240-41. The Davis court also emphasized that the memoranda were not formal reprimands. Id. at 1240. Thus, the Eleventh Circuit held that the memoranda did not meet statutory threshold to be actionable adverse employment actions. Id. at 1240-41.

Here, at first blush, it seems as though Plaintiff did not suffer an adverse employment action. After all, it is true that Plaintiff admits that he lost no income as a result of the written reprimand. (Wallace Dep. at 129.) Loss in income, however, is but one indicator of an adverse employment action. Indeed, Davis noted used the absence of loss of income as only one example – in addition to the absence of loss of benefits, lack of disqualification from promotions, and the nonexistence of the possibility of more formal discipline – of how the performance memoranda were not adverse employment actions. In contrast to the Davis memoranda, Plaintiff's written reprimand included the following statement, "Continued misuse of Department computer equipment will result in further disciplinary action including, but not limited to, termination of employment."  (Plf's. Reply Def's. Response Plf's. Mot. Summ. J., Ex. 2A.) Unlike the performance evaluations in Davis, Plaintiff's reprimand specifically stated that future actions would result in further, and possibly more serious disciplinary action. Though other circuits may reach different results on these facts, the Davis court did not appear to remove the type of reprimand at issue here from falling within the ambit of an adverse employment action. Nevertheless, the Court need not resolve this issue because Plaintiff, as

22

explained below, fails to demonstrate a causal connection.

### b.      Causal Connection

Third, a plaintiff must prove that the adverse action was causally connected to the protected expression.  <u>Weeks</u>, 291 F.3d at 1311.  To establish a causal connection, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.  <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1354 (11th Cir. 1999).  Events can be said to not be wholly unrelated if there is a close temporal relationship between the protected activity and the adverse employment action.  <u>Compare</u> <u>Maniccia</u>, 171 F.3d at 1370 (citing <u>O'Connor v. Chicago Transit Auth.</u>, 985 F.2d 1362, 1370 (7th Cir. 1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir. 1998) (13-month delay between protected activity and termination too long for causation to be established); <u>Conner v. Schnuck Markets, Inc.</u>, 121 F.3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation), <u>with</u> <u>Donnellon v. Fruehauf Corp.</u>, 794 F.2d 598, 601 (11th Cir. 1986) (that plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation.")).

Here, Plaintiff claims that his June 28, 2002, reprimand was an act of retaliation for "filing a EEOC complaint."  (Plf's. Mot. Summ. J. ¶ 7.)  Plaintiff cannot establish a close temporal relationship between his reprimand and either of his two EEOC filings.  First, Plaintiff's EEOC charge # 11BA200035, which was filed on November 19, 2001, creates a

seven-month lag from the filing the reprimand, which is insufficient to establish an inference

of causation.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing

affirmatively several court of appeals decisions for the proposition that a three to four month

gap is insufficient to establish the causal relation prong in a retaliation case); Wascura v. City

of South Miami, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (three and one-half month period

between plaintiff's protected conduct and the adverse employment action challenged does not,

standing alone, establish a causal connection).   Second, Plaintiff's reprimand occurred before

he filed EEOC charge # 11BA200199 on August 2, 2002; thus, it would be impossible for the

latter to beget the former.   Because Plaintiff has failed to establish a causal link between his

reprimand and his EEOC filings, Defendant is entitled to summary judgment on this claim.

### 3.    Hostile Work Environment

To analyze this issue, the Court must first explain some foundational principles of hostile

work environment law.   Most hostile work environment law has developed in the sexual

harassment context.  3 Lex K. Larson, Employment Discrimination, § 52.02, at 52-4 (2d ed.

2005) (hereinafter "Larson").  Thus, courts adjudicating in the racially hostile work environment

context typically turn to sexually hostile work environment cases for analogous principles.  Id.

To properly address the present claim, this Court shall do the same.   Sexual harassment may

take either of two forms: (1) quid pro quo harassment; or (2) hostile work environment

harassment.  Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1200 n.3 (11th Cir. 2001).  The

difference between the forms is that the hostile work environment claims do not result in

tangible employment actions; whereas, quid pro quo claims do.  Id.  A "tangible employment" action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).

To illustrate, the Supreme Court explained, "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands [a quid pro quo claim], he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998) (emphasis added).  In contrast, "[f]or any sexual harassment preceding the employment decision to be actionable [as a hostile work environment claim], however, the conduct must be severe or pervasive."  Id. at 754.

The concept of quid pro quo harassment does not exist in the racial discrimination context.  Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996).  Instead, Title VII has other labels and mechanisms to handle adverse tangible employment actions motivated by racial animus.  However, the concept of hostile work environment does exist in the racial discrimination context.  It bears repeating that hostile work environment claims do not turn on tangible employment actions.  Rather, a hostile work environment claim by its very nature involves repeated conduct that does not occur on any particular day.  Morgan, 536 U.S. at 115. Indeed, with a hostile work claim, a single act of harassment may not be actionable on its own

25

to create a hostile work environment.  Id.  (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Thus, courts allow plaintiffs to aggregate otherwise unactionable events to show a discriminatory, hostile work environment.  In that respect, "a hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Shields, 305 F.3d at 1282 (citing 42 U.S.C.A. § 2000e-5(e)(1)).

The Court construes Plaintiff's allegations of a hostile work environment to include the following incidents: (1) an incident when his former supervisor, Mike Adams, stated, "You need to put Roger's shit aside and do yours because this is going to be your ass on the line, not Roger's;" (2) a written reprimand Plaintiff received for alleged misuse of a GDOT computer; (3) the investigation leading to the written reprimand; (4) what Plaintiff perceives as undesirable work assignments; (5) what Plaintiff perceives as unfair performance evaluations; (6) what Plaintiff perceives as improper handling of his accommodation requests for hand and arm pain caused by repetitive mouse clicking.

However, Defendant's Motion for Summary Judgment only touched on the undesireable work assignements and the statement allegedly made by Adams.  Because the Court has construed Plaintiff's hostile work environment claim to encompass the six incidents outlined above, the Court, at this point in the litigation, denies summary judgment to Defendant.  However, Defendant may refile a Motion for Summary Judgment to address this conduct no later than 30 days after this Order is entered on the docket.  If Defendant chooses to re-file its motion, the Court would appreciate analysis on whether adverse and tangible employment

actions that are independently actionable and definitionally distinct from the employment practices that would give rise to a hostile work environment claim can nevertheless be analyzed in a hostile work environment claim.  That is, for example, whether Plaintiff can incorporate his disparate treatment claims into his hostile work environment claim.

### E.        Disparate Impact Based on Race

The Eleventh Circuit has held the following regarding disparate impact cases:

> [The] disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group. . . .  The doctrine seeks the removal of employment obstacles, not required by business necessity, which create built-in headwinds and freeze out protected groups from job opportunities and advancement. . . . [T]he premise of disparate impact theory is that some employment practices, adopted without a deliberately discriminatory motive, may be the functional equivalent of intentional discrimination. . . .  In essence, disparate impact theory is a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices.

> The disparate impact framework under Title VII by now is well-settled. Since Griggs, Congress has codified the appropriate burdens of proof in a disparate impact case in 42 U.S.C. § 2000e-2(k) (1994), and a settled jurisprudence has arisen to implement the methodology. . . .
> . . .
> According to Title VII, [i]n the first stage of a disparate impact case, the complaining party [must] demonstrate [ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin. . . .  In other words, in order to surmount the first hurdle in a disparate impact race discrimination case, the plaintiff must make out a prima facie case that [a] facially neutral employment practice ha[s] a significantly discriminatory impact.  . . .[Thus, t]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . .

EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274-75 (11th Cir. 2000) (internal citations and

quotation marks omitted).

> The focus during this first stage of the inquiry, and indeed during the whole of the disparate impact analysis, is on defining the qualified applicant pool. In order to determine whether an employment practice causes a disparate impact, the court must gain some handle on the baseline racial composition that the impact is disparate from; that is, what should the racial composition of the job force look like absent the offending employment practice. [S]tatistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value. . . .  The Supreme Court has described as nonsensical comparisons to a baseline pool that is not adequately tailored to reflect only those potential applicants who are actually qualified for the job or job benefit at issue. . . .  To adequately assess statistical data, there must be evidence identifying the basic qualifications [for the job or job benefit at issue] and a determination, based upon these qualifications, of the relevant statistical pool with which to make the appropriate comparisons. . . .

In re Employment Discrimination Litigation Against State of Ala., 198 F.3d 1305, 1311-12

(11th Cir. 1999) (internal citations and quotation marks omitted).

Here, while Plaintiff has submitted many documents to support his claim, none of them

constitute evidence of the variety necessary to undertake the inquiry set forth in the above

paragraphs.   Therefore, Defendant is entitled to summary judgment on this claim, and,

consequently, Plaintiff's Motion for Summary Judgment on this claim is denied.

**F.     The Americans with Disabilities Act**

Plaintiff has asserted claims under the ADA.  The ADA's purpose is "'to provide a clear

and comprehensive national mandate for the elimination of discrimination against individuals

with disabilities.'"  Miller v. King, 384 F.3d 1248, 1267 (11th Cir. 2004) (quoting 42 U.S.C.

§ 12101(b)(1) (West 1995)).  The ADA generally prohibits discrimination against disabled

individuals in the areas of employment (Title I); public services, programs, and activities (Title II); and public accommodations (Title III).  Miller, 384 F.3d at 1268.  This case involves claims for monetary damages and injunctive relief under Title I and Title II of the ADA.[1]  The Court shall analyze Plaintiff's claims in the following manner: (1) monetary damages under Title I; (2) injunctive relief under Title I; (3) monetary damages under Title II; and (4) injunctive relief under Title II.

### 1.      Monetary Damages Under Title I

Defendant argues that Plaintiff's ADA claims are barred by the Eleventh Amendment.[2]  The Court agrees with respect to claims brought under Title I of the ADA for monetary damages.  The Eleventh Amendment to the Constitution of the United States provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by

---

[1]Plaintiff's complaint and subsequent pleadings have only made reference to the ADA in general and do not differentiate between Title I and Title II.  Additionally, Plaintiff's complaint states that Plaintiff seeks injunctive and monetary relief.  Because Plaintiff is proceeding *pro se*, the Court construes his complaint broadly to encompass a claim under Title II as well as Title I.

[2]Even though Plaintiff's response did not address Defendant's Eleventh Amendment argument, this Court cannot consider the ADA claim abandoned.  It is true that Federal Rule of Civil Procedure 56(e) provides that where "the adverse party does not respond, summary judgment, *if appropriate*, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e); Wolf Crane, 374 F.3d at 1039.  But, summary judgment is only appropriate "where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Wolf Crane, 374 F.3d at 1039 (internal quotation marks omitted).  Thus, it is not appropriate to grant summary judgment without considering the merits of the motion.  Id. at 1040.

Citizens or Subjects of any Foreign State."  U.S. Const. amend. 11.

By its terms the Eleventh Amendment only bars suits against a State by citizens of either another State or a foreign state. The Supreme Court, however, has interpreted the Eleventh Amendment to bar suits by a citizen against his or her own State.  Univ. of Ala. Bd. of Trs. v. Garrett, 531 U.S. 356, 363 (2001).  Thus, the Eleventh Amendment's ultimate guarantee is that non-consenting States may not be sued by private individuals in federal court.

A State's Eleventh Amendment Immunity, however, may be overcome in two ways. First, the State may waive it.  Second, Congress may abrogate it.  Neither party has argued that Georgia has waived its Eleventh Amendment immunity for ADA cases.  Thus, this analysis shall focus on abrogation.

Congress may abrogate the States' Eleventh Amendment immunity when it unequivocally intends to do so and acts under § 5 of the United States Constitution's Fourteenth Amendment.  Id. at 363.  The Garrett Court held that Congress had not abrogated the States' Eleventh Amendment Immunity from suits for monetary damages under Title I of the ADA. Id. at  374.  Therefore, to the extent that Plaintiff's ADA claim is based on Title I and seeks monetary damages, Defendant is entitled to summary judgment on the issue.

### 2.        Injunctive Relief Under Title I and Title II

In addition to his claims for  monetary damages, Plaintiff seeks injunctive relief under the ADA.  Defendant argues that Plaintiff's ADA claim for injunctive relief may only be brought against state officials in their official capacities under Ex parte Young, 209 U.S. 123

(1908).  Citing <u>Mason v. Stallings</u>, 82 F.3d 1007, 1009 (11th Cir. 1996), Defendant argues that

because Plaintiff's ADA claim is only against the statutory employer, GDOT, not any state

official, Plaintiff's ADA claim for injunctive relief is barred by the Eleventh Amendment.  The

Court agrees.

In <u>Ex parte Young</u>, the Supreme Court held that official capacity suits for prospective

relief to enjoin state officials from enforcing unconstitutional acts are not deemed to be suits

against the state and thus are not barred by the Eleventh Amendment.  209 U.S. at 167-68; <u>Scott</u>

<u>v. Taylor</u>, --- F.3d ----, No. 04-11302, 2005 WL 845679, at * 3 (11th Cir. 2005) (discussing <u>Ex</u>

<u>parte Young</u>).  Thus, generally, suing a state official for injunctive relief is a way to skirt a

State's Eleventh Amendment immunity because it is not an action against a State.  <u>Kentucky</u>

<u>v. Graham</u>, 473 U.S. 159, 167 n.14 (1985) ("[I]mplementation of state policy or custom may be

reached in federal court only because official-capacity actions for prospective relief are not

treated as actions against the State.").  Indeed, "Unless a State has waived its Eleventh

Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its

own name regardless of the relief sought."  <u>Id.</u>

In <u>Garrett</u>, the Supreme Court noted that Title I did not bar suits for injunctive relief.

531 U.S. 374 n.9.  The <u>Garrett</u> Court's reasoning, however, was within the contours of suits for

prospective injunctive relief against state officials in their official capacities, not against the

state itself or an arm of the state.  <u>See id.</u> (citing <u>Ex Parte Young</u>).  Thus, <u>Garrett</u> reenforces the

proposition that if a plaintiff makes a claim for injunctive relief against a state, it must be made

against a state official in his or her official capacity.

Here, Plaintiff failed to overcome the Eleventh Amendment because he has not sued a state official in his or her official capacity.  The only named Defendant this case is GDOT, and there can be no argument that GDOT is a state official.  Rather, <u>Stephens</u> found that GDOT is an arm of the State of Georgia and enjoys the same Eleventh Amendment protections afforded to Georgia.  While Plaintiff's complaint does reference David Crim, Joe Cowan, and Roger Fowler, the Court has no indication that they are state officials, and Plaintiff does not appear to have alleged or set forth sufficient evidence that they are such.

Moreover, even if these men were state officials, Defendant asserts that Plaintiff never caused them to be served or issued waiver of service of summons.  This Court's review of the docket reveals that Defendant is correct, as no returns of service are on file for these three men. Federal Rule of Civil Procedure 4(m) provides the following:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, . . . after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).  Plaintiff's 120 days passed long ago.  Therefore, if no later than 15 days after this Order is entered on the docket Plaintiff fails to show good cause for his failure to serve these individuals, the Court shall dismiss them without prejudice. Therefore, under the current complaint, Defendant is entitled to summary judgment on the Title I and Title II claims for injunctive relief against GDOT.

32

### 3.      Monetary Damages Under Title II

Title II of the ADA provides that "'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" Miller, 384 F.3d at 1268 (quoting 42 U.S.C.A. § 12132) (emphasis deleted).  A public entity includes divisions, departments, and agencies of state governments.  42 U.S.C.A. § 12131(1)(A)-(B).  The Eleventh Circuit has interpreted Title II to encompass claims for public employment discrimination.  Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 820 (11th Cir. 1998) (not addressing Eleventh Amendment immunity).  However, the Eleventh Circuit has yet to address whether the Eleventh Amendment immunizes States from suits for monetary damages for violations of Title II in the employment context.

As noted above, the Court construes Plaintiff's complaint as raising a claim under Title II.  Title II, however, was not specifically addressed by Defendant in its motion for summary judgment.  Therefore, Defendant may refile a motion for summary judgment regarding this issue no later than thirty days after this order is entered on the docket.

### III.      CONCLUSION

Defendant's Motion for Summary Judgment (Doc. 49) is granted in part and denied in part.  Specifically, summary judgment is granted to Defendant on every claim raised in its Motion except for disparate treatment in discipline and hostile work environment claim.  Plaintiff's Motion for Summary Judgment (Doc. 48) is denied.  Defendant may refile a motion

for summary judgment regarding the ADA, Title II issue and the hostile work environment issue

no later than thirty days after this order is entered on the docket.

SO ORDERED, this the 23rd day of August, 2005.

  /s/ Hugh Lawson
**HUGH LAWSON, Judge**

jmb

34